UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

TERRENCE WALTERS,

Defendant.

Criminal No. 07-346 (JDB)

FILED

JUN 0 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### MEMORANDUM AND ORDER

On May 19, 2008, and May 22, 2008, the Court held a hearing on defendant Terrence Walters' motion to suppress. Walters seeks to suppress tangible evidence seized during the search of his person and automobile on November 14, 2007, and during the subsequent search of his apartment on November 19, 2007. He also seeks to suppress statements he made to the United States Park Police before and after his arrest. At the hearing, the government conceded that Walters' statements on the scene following his arrest were obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and therefore would not be used at trial. Moreover, the government represented that it would not rely on or admit any statement that Walters later made at the station house, since the videotape of that statement cannot be found. The Court will address here the portions of Walters' motion that remain in dispute.

On the evening of November 14, 2007, Detective Glenn Luppino of the United States Park Police was sitting in an unmarked cruiser at a red light at the intersection of South Capitol and Galveston Streets, N.W., in Washington, D.C. Tr. of Motions Hr'g at 14. In the car with Detective Luppino were three other United States Park Police officers: Detective Sergeant Gregory Monahan, Detective Timothy Hodge, and Detective Robert Scherr. Id. at 13. To Luppino's right, he saw Walters' blue four-door Buick about to cross in front of the cruiser. Id. at

14. As the Buick proceeded through the intersection directly in front of him, Luppino noticed that the vehicle's windows were heavily tinted and obscured any view into the interior. Id. at 18. Believing Walters' windows were tinted in violation of the law, Luppino decided to initiate a traffic stop for a window tint violation. Id. at 14.

After Luppino activated the cruiser's emergency lights and sirens, Walters pulled over to the side of the road. Sergeant Monahan approached the vehicle first to inform Walters of the reason for the traffic stop and asked for Walters' license and registration. Id. at 103. Before Walters had time to retrieve the documentation, Monahan was struck by the "strong odor" of marijuana coming from inside the vehicle. Id. at 103-04. By this time, Luppino had joined Monahan at the driver's side window, and he too testified that "the first thing [he] noticed was the strong odor of marijuana, burning marijuana that was emanating from within the car." Id. at 22. According to the officers, Walters appeared nervous, and his hands were visibly shaking. Id. at 105.

Monahan told Walters the officers smelled marijuana and asked him if he had any narcotics, specifically marijuana, on his person or in the vehicle. Id. at 104. In response to Monahan's question, Walters "made a quick motion towards his right side." Id. at 105. Because the traffic stop was initiated in a high-crime area and because Monahan was concerned that Walters might be reaching for a weapon, he quickly grabbed Walters' hands before he could make contact with his waistband or jacket. Id. at 106. Monahan then asked Walters again if he had anything on him, and Walters "indicated that he had marijuana on his person, and that it was on his right side." Id. at 108.[1] Walters turned toward the driver's side of the vehicle to give the

---

[1] The testimony was unclear as to whether Walters made a statement or simply gestured to this effect. The parties' briefs address the action as a gesture, so this Court will do the same. In

-3-

officers access to his outer right jacket pocket, and Luppino reached into the pocket and recovered marijuana and a lighter. Id. Walters was then asked to step out of the vehicle and was placed under arrest, and Luppino and Hodge began searching the vehicle. Id.

The officers recovered a box of Phillies Blunt Strawberry cigars from the front seat, and they found money and a cell phone on Walters. In a backpack on the floorboard behind the passenger seat, the officers found 519 grams of cocaine, a loaded and operable Taurus 9 mm semi-automatic handgun, mail matter, Walters' passport, and a wallet. Gov't Opp. at 3. Three days later, on November 19, 2007, officers executed a search warrant on Walters' Washington, D.C. apartment and recovered thirty-three grams of crack cocaine, drug paraphernalia, tally sheets, an unloaded .380 caliber semi-automatic handgun, a loaded .45 caliber semi-automatic handgun, ammunition, and a cleaning kit. Id. at 4-5.

In support of his motion to suppress, Walters first argues that based upon the officers' misunderstanding of D.C. Code § 50-2207.02, there was no probable cause for the initial traffic stop. See Whren v. United States, 517 U.S. 806, 810 (D.C. Cir. 1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Luppino correctly testified that District of Columbia law requires vehicles to allow seventy percent of available light to transmit through the front driver and passenger windows. Tr. of Motions Hr'g at 15; D.C. Code § 50-2207.02(a)(1). However, when an out-of-state vehicle is in the District of Columbia, Luppino testified that it was his belief that District of Columbia law required the out-of-state vehicle to be in compliance with its own state's window tint regulations. Tr. of Motions Hr'g at 53. Because Walters' vehicle was

---

any event, the identical rationale applies regardless of whether the action was a statement or a gesture.

registered in Maryland and because Luppino believed that Walters' window tint allowed less than Maryland's requirement of thirty-five percent of available light to transmit through the front side windows, Luppino believed Walters was in violation of Maryland's tint regulations and was therefore in violation of District of Columbia law. Id. In fact, however, as the government now acknowledges, District of Columbia law provides that no vehicle may be operated or parked upon the public streets or spaces of the District of Columbia with a "front windshield or front side windows that allow less than 70% light transmittance," regardless of where the car is registered. D.C. Code § 50-2207.02(a)(1)(A).

Walters is correct in asserting that "[s]tops premised on a mistake of law, even a reasonable, good-faith mistake, are generally held to be unconstitutional." United States v. Booker, 496 F.3d 717, 722 (D.C. Cir. 2007) (quoting United States v. Coplin, 463 F.3d 96, 101 (1st Cir. 2006)). "A stop is lawful despite a mistake of law, however, if an objectively valid basis for the stop nonetheless exists." Id. (citing United States v. Southerland, 486 F.3d 1355 (D.C. Cir. 2007)). For example, "[i]n situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision." United State v. Delfin-Colina, 464 F.3d 392, 399 (3d Cir. 2006) (cited favorably in Booker, 496 F.3d 717, 722).

Here, Luppino relied on a mistaken understanding of D.C. Code § 50-2207.02, believing that window tint requirements were more lenient for Walters since his car was registered in Maryland. If the law had been as Luppino believed, Walters would have been in violation of Maryland's requirements. More importantly, however, Walters actually was in violation of D.C. Code § 50-2207.02(a)(1). When Detective Hodge conducted a test of the window tint after the

vehicle was stopped, the test revealed that Walters' front driver's side window permitted only ten percent of available light to pass through. Tr. of Motions Hr'g at 143. Hence, Walters' vehicle allowed far less light transmittal than the District of Columbia requirement of seventy percent. And Walters was in fact ticketed for a violation of D.C. Code § 50-2207.02. The correct basis for the violation was just slightly different than Luppino understood. Nonetheless, there was plainly an objectively reasonable basis for the initial traffic stop.

Walters next argues that "neither probable cause or a reasonable and articulable suspicion can be demonstrated by the officers in this case" to justify the questioning of Walters and the subsequent search of his person and his vehicle following the traffic stop. Def.'s Supp. Mot. at 5. Because "[i]t is undisputed that a tinted window violation is not an arrestable offense and does not justify the search of a person or his or her vehicle without more," United States v. Green, 437 F. Supp. 2d 38, 41-42 (D.D.C. 2006) (citing John Doe v. Metro. Police Dept. of D.C., 445 F.3d 460, 469 (D.C. Cir. 2006)), the government argues that probable cause arose from the distinct odor of marijuana. In response to this assertion, Walters testified that he never smoked marijuana in the car on the day of the arrest, and he argues that "there was no evidence of any smoked marijuana, such as a smoked joint, blunt, or ashes" found in the vehicle. Def.'s Supp. Mot. at 6. Although the vehicle contained an open box of Phillies Blunt Strawberry cigars, which are often used to smoke marijuana, the remaining cigars were still packaged in their individual wrappers. Walters therefore argues that without corroborating evidence, the Court should not rely on the testimony of the officers regarding the odor of marijuana.

The Court, however, finds the testimony of Luppino and Monahan on this point to be

credible.[2] Based on their training in the detection of marijuana, Luppino and Monahan clearly stated that the odor of marijuana was unmistakable. Additionally, the officers recovered a lighter and cigars, which provide circumstantial support that marijuana could have been smoked in the vehicle. Because the officers stopped the vehicle for a window tint violation minutes after first seeing the car, evidence of smoked marijuana could have been disposed of before the officers stopped Walters. And even if Walters had not smoked marijuana in the car on the day of the arrest, the odor of marijuana could nonetheless have been present for a number of reasons. Someone else could have smoked marijuana in Walters' car on November 14, 2007, or Walters or someone else could have smoked marijuana before entering the car such that the odor permeated the vehicle's interior.

Walters takes issue with the officers' failure to immediately arrest him based upon the odor of marijuana. Instead, Monahan asked Walters if he had any narcotics, specifically marijuana, on his person or in his vehicle. Walters argues that this question violated his rights under Miranda and that his gesture in response -- reaching down to his waist area -- should be suppressed.

The Court, however, finds Monahan's conduct to be reasonable and perhaps even preferable to an approach that would require an immediate arrest of all persons in vehicles that emit the odor of marijuana. The government argues that Monahan's question was appropriately made in the context of an initial investigative stop. In Berkemer v. McCarty, 468 U.S. 420, 439 (1984), the Supreme Court stated that "the usual traffic stop is more analogous to a so-called 'Terry stop,' see Terry v. Ohio, 392 U.S. 1 (1968), than to a formal arrest." In these situations, an "officer may ask the detainee a moderate number of questions to determine his identity and to try

---

[2] As a general matter, the Court found the officers' version of events to be credible overall. Indeed, it was only on this one point that countervailing evidence was presented.

to obtain information confirming or dispelling the officer's suspicions." Berkemer, 468 U.S. at 439. In United States v. Gale, 952 F.2d 1412, 1415 (D.C. Cir. 1992), the D.C. Circuit held that the police had engaged in reasonable investigative questioning when they "parked their cars in a manner that blocked appellant's car, approached him while he was sitting in his car, asked to see his driver's license and then asked him if he had any drugs."  Similarly here, Monahan's question was meant to confirm or dispel his suspicion that Walters possessed marijuana in the car.  An "officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring."  United States v. Hunnicutt,  135 F.3d 1345, 1349 (10th Cir. 1998).  Based on this case law and the facts of the current case, Monahan made an appropriate limited inquiry to address his suspicions, and Walters' resulting gesture is thus admissible against him.

Although the exchange following Walters' initial gesture was completed within a matter of seconds, Walters attempts to dissect the exchange to argue that he was in custody for purposes of Miranda when Monahan grabbed his hands and repeated his question, leading to the second gesture.  Thus, Walters argues that his second gesture -- indicating that there was marijuana in his right front pocket -- should be suppressed on the ground that it was obtained in violation of his Miranda rights.

An officer's obligation to administer the warnings described in Miranda is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  The Supreme Court has addressed the definition of "custody" in several cases, but has emphasized that "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)); see also United States v. Calloway, 298 F. Supp. 2d 39, 47-48 (D.D.C. 2003) (discussing Beheler and subsequent cases, and concluding that "the circumstances surrounding the interrogation must constitute the functional equivalent of a formal arrest") (emphasis in original). The relevant inquiry is an objective one focusing on "how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442. The defendant bears the burden of proving custody by a preponderance of the evidence. See United States v. Goldberger, 837 F. Supp. 447, 452 n.4 (D.D.C. 1993).

    The Second Circuit has stated that the pertinent considerations for determining whether an intrusive detention constitutes an arrest include "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, . . . and in particular such factors as the number of agents involved . . . ; whether the target of the stop was suspected of being armed . . . ; the duration of the stop . . . ; and the physical treatment of the suspect . . . , including whether or not handcuffs were used." Oliveira v. Mayer, 23 F.3d 642, 645 (2d Cir. 1994). Here, to protect himself and his partner, Monahan grabbed Walters' hands as he reached toward his waistband. Monahan had only seconds to react to the possible threat, used a very limited amount of force in reaction to Walters' gesture, and only restrained his hands for a few seconds until Luppino retrieved the items Walters was reaching for. See United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) ("law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders").

    This Circuit has observed in United States v. Gaston, 357 F.3d 77, 82 (D.C. Cir. 2004), that there is some authority to support the proposition that the more formal restraint of

handcuffing itself does not even automatically constitute custody, and is instead just one factor to be considered. See 357 F.3d at 82 (citing United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995), and United States v. Bautista, 684 F.2d 1286, 1291-92 (9th Cir. 1982)). Gaston thus suggests that where circumstances otherwise indicate the lack of a coercive setting -- for example, no weapons are drawn (Leshuk, 65 F.3d at 1110) or the language used to summon the defendant is not threatening (Bautista, 684 F.2d at 1292) -- one might find an absence of custody notwithstanding the use of the more formal restraint of handcuffs.

Here, considering the totality of the circumstances, the Court finds that Walters was not "in custody" when Monahan briefly grabbed his hands for security purposes. The Court finds that a reasonable person in Walters' position would not have believed that he was subject to the functional equivalent of an arrest. The officers never unholstered or displayed their weapons, and the setting was no more coercive than a typical traffic stop. Thus, the Court does not find that the temporary restraint of Walters' hands in response to a possible threat to the officers' security is sufficient to transform the setting for the investigative question into a custodial setting. In a matter of seconds, Monahan grabbed Walters' hands and repeated his original question to confirm or alleviate his suspicions about Walters' possession of illegal drugs. Walters' second gesture to indicate that marijuana was in his coat pocket was therefore not obtained in violation of his Miranda rights and is admissible against him. After Walters indicated he had marijuana in his jacket, the officers had probable cause to arrest him, to search his person, and to search the vehicle incident to his arrest. See Chimel v. California, 395 U.S. 752, 763 (1969). Hence, the tangible evidence that was recovered from these searches is also admissible.

Following the arrest, Investigator Andrew Keness applied for a Superior Court search warrant for Walters' apartment located on Martin Luther King Avenue in Washington, D.C.

Walters argues that the supporting affidavit is in violation of Franks v. Delaware, 438 U.S. 154 (1978), because the affidavit did not reveal that the police had information about other addresses related to Walters. Specifically, when Walters was stopped by the police, he told them that he lived in Clinton, Maryland, and when he presented his driver's license at the station house, it listed a Fort Washington, Maryland address. Moreover, although considerable mail matter for Walters at the Martin Luther King Avenue address was recovered from his vehicle, there was also mail matter for Maryland addresses. Based on this information, Walters requested an evidentiary hearing under Franks, arguing that the elements omitted from the affidavit were material to the finding of probable cause. It is also true, however, that "if the addition of the omitted facts would not have altered the probable cause determination," then there has been no Franks violation. United States v. Akinyemi, 1994 WL 475820, at *1 (D.C. Cir. Aug. 19, 1994) (citing United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)).

During the motions hearing on May 19, 2008, the Court heard testimony from the affiant, Investigator Andrew Keness, regarding his decision to apply for a search warrant for the Martin Luther King Avenue apartment and regarding the omission from his affidavit of the other addresses related to Walters. Keness testified that after Walters' arrest, Luppino and Monahan provided him with information for the affidavit. Tr. of Motions Hr'g at 157. Luppino gave Keness a packet of materials, which included mail matter that was found in the car addressed to Walters at the Martin Luther King Avenue apartment and all of the police paperwork relating to the November 14, 2007 arrest. Id. at 158. According to Luppino, the police paperwork listed the Clinton, Maryland address because the officers are always required to list the address provided by the defendant. Id. at 94. Despite Walters' license and material recovered in the car with the Clinton, Maryland address, such as automobile repair receipts, Luppino testified that he believed

Walters lived at the Martin Luther King Avenue apartment based on the "paperwork, mail matter, bank receipts, [and] bank statements" sent to Walters at that location. Id. at 45. Luppino shared this belief with Keness before the search warrant was sought.

Based on all of the information that was provided, Keness and Scherr conducted a rudimentary investigation. Using Walters' keys that were recovered during his arrest, Keness and Scherr went to the Martin Luther King Avenue address. Id. at 158. The apartment building had a locked front entrance that led to a common area. Keness discovered that one of Walters' keys opened the main front entrance. Id. at 159. The officers then entered the building and saw that the name "Walters" was posted on the mailbox for apartment 7B. Id. Based on the mail matter addressed to Walters at the Martin Luther King Avenue apartment, Walters' key to the apartment building, and his last name on the mailbox, Keness decided to request a search warrant for that address. Id. at 151-52.

In the affidavit in support of the search warrant, Keness relied on his training, experience, and participation in narcotics-related investigations to assert his personal knowledge that individuals who traffic in narcotics regularly maintain material evidence "in their residence," such as "documents relating to transportation, ordering, purchase and distribution of controlled substances." Affidavit at 2. Keness also stated in the affidavit that such individuals generally maintain bank statements, money orders, and "other items evidencing the obtaining, secreting transfer or concealment of assets" "in a secure area so the narcotics trafficker can gain ready access to them and protect them from discovery from law enforcement." Id. at 2. To connect Walters to the apartment, Keness explained that "[a]t the time of his arrest Walters had mail matter and bank statements in the vehicle" with the Martin Luther King Avenue address, that he had keys on him that opened the front door of the apartment building, and that "the mailbox for

-11-

7B in the apartment building has the name Walters." Id. at 3. Based on this information, the Court agrees with the Superior Court judge that the totality of the circumstances supported probable cause for the issuance of the search warrant.

This does not mean that it was appropriate for Keness to omit information about the other addresses linked to Walters, and the Court does not condone the omission of this material. To the contrary, the Court agrees with Walters that the issuing judge should have been given all of the relevant information for his consideration. However, the Court finds that the inclusion of the omitted material would not have altered the probable cause determination in this matter. To support his argument to the contrary, Walters relies primarily on a distinguishable case from the middle district of Tennessee. In United States v. Pope, 330 F. Supp. 2d 948 (M.D. Tenn. 2004), the police executed a warrant for two residences associated with the defendant. In the affidavit to obtain the warrants, the affiant indicated that all illegal activity allegedly occurred at the defendant's first address. Id. at 956. The only references to the defendant's second address indicated that the defendant used and paid utilities there, that a vehicle registered to the defendant had been seen at that address, and that a police officer and an informant had seen him go back and forth between the two residences. Id.

Based upon the affiant's statement that people who own firearms generally keep them in their residences and based upon the indication that Pope used the first address for illegal activity, the government argued that there was a sufficient nexus to support probable cause, and the district court agreed as to the first address. Id. Since the criminal venture in Pope seemed to occur at just the first address and no reason was given to indicate that evidence would be transported between the defendant's addresses, the court concluded that the warrant was issued without probable cause as to the second address. See id. at 957 (stating that "for information about a criminal venture in

one residence to justify a search of another residence, there must be some additional reason to suggest that evidence is likely to be transported between the two"). In so concluding, the court indicated its reluctance to open the door to the possibility that warrants could be obtained to search any property remotely connected to a defendant. Id.

In Pope, then, unlike here, there was strong evidence establishing that the defendant had two different residences. Here, there is evidence that Walters used the Martin Luther King Avenue apartment as a residence, and there is weaker evidence connecting Walters to other addresses. Although Walters claimed to live in Clinton, Maryland, the police are not obligated to trust and rely on the defendant's assertion of where he lives. And although Walters presented a driver's license with a Fort Washington, Maryland address, this did not prevent the police from investigating prior to applying for a search warrant. Based on their further investigation, the evidence supported the conclusion that Walters used the Martin Luther King Avenue apartment. In Pope, moreover, there was also overwhelming evidence connecting the defendant's illegal activity to just one address, and any attempts to search the defendant's other address seemed to constitute overreaching by the police. There is no such concern in this case where the search warrant was sought for only one address and no evidence connected the criminal activity more strongly to another address.

Here, in Keness' affidavit, the mail matter, the keys, and the mailbox all support the conclusion that Walters used the D.C. apartment as a residence. Because the D.C. Circuit has held that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence," and because the affiant stated that in his experience people who traffic in

-13-

narcotics keep evidence in a secure area such as their home, there was probable cause on the face of the affidavit to search the D.C. apartment. United States v. Thomas, 989 F.2d 1252, 1255 (D.C. Cir. 1993). If Keness had included information about the Clinton, Maryland and Fort Washington, Maryland addresses, the affidavit would still have contained a sufficient nexus between Walters and the Martin Luther King Avenue apartment to provide probable cause to search it.

Accordingly, it is hereby

**ORDERED** that as to the still-contested portions of [8] Walters' first motion to suppress tangible evidence and statements and [15] Walters' supplemental motion to suppress tangible evidence and statements, and for the reasons explained above, the motions are **DENIED**.

**SO ORDERED**.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:   June 2, 2008